# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| LOUIS D'ONOFRIO,<br>    *Plaintiff*,<br><br>    v.<br><br>WESTPORT/WESTON HEALTH DISTRICT<br>and MARK COOPER,<br>    *Defendants*. | No. 3:21-cv-1052 (JAM) |

## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

Plaintiff Louis D'Onofrio was the Director of Community Health at the Westport/Weston Health District. But right after he took the job, he began to complain about his working conditions. Most seriously, he was worried that the District's budget had an unexplained shortfall. For the next two years, he complained continually about that and other topics. Eventually, he did not get a bonus he was expecting and quit.

D'Onofrio has now filed this lawsuit against the District and its director, claiming that they illegally retaliated against him because of his complaints. The defendants have moved to dismiss his claims. Because only some of his allegations state a plausible claim for relief, I will grant the motion in part and deny it in part.

### BACKGROUND

The District is Westport and Weston's joint health department. It handles infectious diseases (for instance, COVID-19 testing and vaccines), environmental hazards, and the like.[1] In April 2019, D'Onofrio became the District's Director of Community Health.[2]

But during his tenure, he claims, the District and its director Mark Cooper retaliated against him because of his protected speech. D'Onofrio believes that he was punished for

---

[1] Doc. #12 at 2 (¶ 4).
[2] *Ibid.* (¶ 6).

speaking about three topics: workplace safety at the District's headquarters, alleged irregularities in the District's budget, and flaws he saw in the District's health programs.

*Workplace safety*. First, D'Onofrio alleges that in 2019, he complained to Cooper that rodents were infesting the office.[3] Unhappy with Cooper's response, he then complained to the Connecticut Interlocal Risk Management Agency.[4] Two years later, still upset about the rodents, he repeated his concerns to the chair of the District's board of directors.[5]

D'Onofrio also alleges that he lodged two other complaints related to workplace health. First, he claims that in April 2021, he spoke with the chair about some "other health and safety concerns."[6] And he says that at an unspecified time, he chastised Cooper for not wearing a mask in the office.[7]

*Missing money*. Next, D'Onofrio alleges that around February 2020, he noticed a $70,000 shortfall in the District's budget. He alleges that when he confronted his boss about the missing money, Cooper could not explain it.[8] Plus, he claims, Cooper then "threatened to eliminate [his] position because" of the missing $70,000.[9] Fourteen months later, in April 2021, D'Onofrio reported the alleged irregularity to the chair of the board and to the police.[10]

*Health programs*. Finally, D'Onofrio claims that he repeatedly shared with Cooper his concerns about the District's health programs. In May 2020, for instance, he allegedly warned Cooper that it would be a mistake for the District to collaborate with a particular company on

---

[3] *Id.* at 3 (¶¶ 9–11).
[4] *Ibid.* (¶ 11).
[5] *Id.* at 5 (¶ 21).
[6] *Ibid.* (¶ 25).
[7] *Id.* at 6 (¶ 29).
[8] *Id.* at 7 (¶¶ 39–41).
[9] *Ibid.* (¶ 39).
[10] *Id.* at 5 (¶¶ 24–25).

COVID-19 testing.[11] And at other unspecified times, he allegedly complained to Cooper about the District's billing policies.[12]

D'Onofrio believes that in retaliation for all these complaints, Cooper began to punish him in various ways. He focuses on four incidents in spring 2021. First, he alleges that Cooper scheduled more COVID-19 vaccine clinics in order to add to his workload.[13] Second, he claims that Cooper "took away a [$1,000] bonus that was to have been given to [him]."[14] Third, he alleges that Cooper launched "an investigation into a fictitious vaccine matter" involving him.[15] And finally, he claims that Cooper ordered District "staff to put laboratory orders in under [his] name without his permission" in order "to provide private free COVID19 testing to Cooper's friends."[16]

Soon after these events, in June 2021, D'Onofrio resigned from his job. He alleges that he quit because his working conditions were "hazardous to health and safety of himself, co-workers, and members of the public."[17]

D'Onofrio has now filed this lawsuit against Cooper and the District. First, he sues Cooper for First Amendment retaliation under 42 U.S.C. § 1983 (Count One).[18] He also sues the District for wrongful discipline or discharge under Conn. Gen. Stat. § 31-51q, in violation of both his First Amendment rights (Count Two) and his free speech rights under the Connecticut

---

[11] *Id.* at 4 (¶¶ 17–20).
[12] *Id.* at 6, 8 (¶¶ 31–32, 42).
[13] *Id.* at 5 (¶¶ 22–23).
[14] *Id.* at 8 (¶ 44).
[15] *Id.* at 6–7 (¶¶ 33–34).
[16] *Id.* at 5 (¶¶ 26–27).
[17] *Id.* at 8 (¶ 45).
[18] *Id.* at 8–9.

Constitution (Count Three).[19] Finally, D'Onofrio sues the District for constructive discharge
(Count Four).[20]

### DISCUSSION

The background principles governing a Rule 12(b)(6) motion to dismiss are well
established. The Court must accept as true all factual matters alleged in a complaint, although a
complaint may not survive unless the facts it recites are enough to state plausible grounds for
relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Mastafa v. Chevron Corp.*, 770 F.3d
170, 177 (2d Cir. 2014).[21] Although this "plausibility" requirement is "not akin to a probability
requirement," it "asks for more than a sheer possibility that a defendant has acted unlawfully."
*Iqbal*, 556 U.S. at 678. Because the focus must be on what facts a complaint alleges, a court is
"not bound to accept as true a legal conclusion couched as a factual allegation" or "to accept as
true allegations that are wholly conclusory." *Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014). In
short, my role in reviewing a motion to dismiss under Rule 12(b)(6) is to determine if the
complaint—apart from any of its conclusory allegations—alleges enough facts to state a facially
plausible claim for relief.

### First Amendment Retaliation (Count One)

In Count One, D'Onofrio claims that Cooper retaliated against him in violation of the
First Amendment. To bring this claim, D'Onofrio must plausibly allege that he has engaged in
speech of the type that is subject to protection in the government employment context, that
Cooper took adverse action against him, and that there is a causal connection between the

---

[19] *Id.* at 9–10.
[20] *Id.* at 10.
[21] Unless otherwise indicated, this opinion omits internal quotation marks, alterations, citations, and footnotes in text
quoted from court decisions.

protected speech and the adverse action. *See Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 94 (2d Cir. 2020); *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015).

In his motion to dismiss, Cooper concedes for now that revoking D'Onofrio's bonus counts as an "adverse action."[22] And Cooper does not contest the link between the action and D'Onofrio's speech. Instead, his only argument for dismissing the § 1983 claim is that the speech was not protected by the First Amendment.

I agree with him only in part. Because a government employer—like any employer—has the right to maintain a reasonably efficient and orderly work environment, the government *qua* employer may restrict or penalize the speech of its own employees in ways that would not be acceptable if the government were regulating the speech of the citizenry in general. *See Ricciuti v. Gyzenis*, 834 F.3d 162, 167–68 (2d Cir. 2016); *Lynch v. Ackley*, 811 F.3d 569, 577 (2d Cir. 2016).

For this reason, when a plaintiff is a public employee who claims that he has been the victim of First Amendment retaliation in the government employment context, his speech is not subject to protection from adverse action unless the speech addressed a matter of public concern and he spoke as a citizen rather than as an employee. *See Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Plus, even when a government employee speaks as a citizen on a matter of public concern, his speech is not protected unless his interest in speaking outweighs his employer's interest in maintaining an orderly workplace. *See Connick v. Myers*, 461 U.S. 138, 142 (1983).

Taking D'Onofrio's complaint as true, his speech about the missing money was protected. First, he made the statements as a citizen, not as an official. An employee does not speak as an official just because his speech "relates to public employment or concerns

---

[22] Doc. #19 at 12 n.7.

information learned in the course of public employment." *Lane v. Franks*, 573 U.S. 228, 239 (2014). Instead, he speaks as an official only if his speech is either "expressly required" by his job or "in furtherance" of his core duties. *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 202–03 (2d Cir. 2010) (explaining that a teacher who criticized her school for making racist staffing decisions spoke as a citizen, because "the grievance she aired was not in furtherance of the execution of one of her core duties as an English teacher" (discussing *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410 (1979))). The "critical question" is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Specht v. City of New York*, 15 F.4th 594, 603–04 (2d Cir. 2021) (quoting *Lane*, 573 U.S. at 240).

Although D'Onofrio learned about the allegedly missing money at work, he spoke about it as a citizen. To start, D'Onofrio was the District's Director of Community Health—not its comptroller. While he does not elaborate on his job description, a fair inference from the complaint is that monitoring the District's budget was not part of his job.[23]

It is also telling that D'Onofrio voiced his concerns to "an independent state agency"— the police—"responsible for entertaining complaints by any citizen in a democratic society regardless of his status as a public employee." *Jackler v. Byrne*, 658 F.3d 225, 241 (2d Cir. 2011). While this is "not dispositive in this case, it does bear on [D'Onofrio's] perspective" and helps confirm that he spoke as a citizen. *Montero v. City of Yonkers*, 890 F.3d 386, 397–98 (2d Cir. 2018). "Nothing in [D'Onofrio's job] description suggests that reporting misconduct to outside agencies would be a normal part of [his] professional activities." *Specht*, 15 F.4th at 604.

---

[23] In arguing otherwise, Cooper submits D'Onofrio's written job description. Doc. #19-2. I may not rely on this document, however, because it was not attached to the complaint and is not integral to it. *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). Yet even if I considered the document, it would only hurt Cooper's argument; nothing in the job description suggests that part of D'Onofrio's job was to monitor the District's budget.

Second, D'Onofrio's speech was of "public concern." "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest." *Lane*, 573 U.S. at 241. Allegations that money is missing from a public agency easily count. *See ibid.* ("[Speech about] misuse of state funds[ ]obviously involves a matter of significant public concern.").

Finally, "if [D'Onofrio's] allegations of [financial] misconduct are indeed true," then the District did not have a legitimate interest in punishing him; "since the statements were made for the very reason that the [District] was not functioning properly," they "could not have adversely affected the [District's] *proper* functioning." *Jackler*, 658 F.3d at 237. In sum, D'Onofrio has plausibly alleged that his speech was protected.

But not every violation of the Constitution justifies an award of money damages under § 1983. That is because the doctrine of qualified immunity protects a government official from liability if "(1) his conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir. 2015); *see also Amore v. Novarro*, 624 F.3d 522, 529–30 (2d Cir. 2010). As the Supreme Court has explained, "a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). Thus, an official is entitled to qualified immunity if, on the basis of the facts known to the official when he engaged in the conduct at issue, "officers of reasonable competence could disagree as to the lawfulness of such conduct." *Manganiello v. City of New York*, 612 F.3d 149, 164–65 (2d Cir. 2010).

Where as here a defendant raises a defense of qualified immunity at the initial pleadings stage, a court must take care not to engage in a premature determination of the facts in a manner at odds with those facts that the plaintiff has pleaded in the complaint. "A defendant presenting an immunity defense on a motion to dismiss must therefore show not only that the facts supporting the defense appear on the face of the complaint, but also that it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Brown v. Halpin*, 885 F.3d 111, 117 (2d Cir. 2018).

At this initial pleading stage, Cooper has yet to establish grounds for qualified immunity. If D'Onofrio's allegations are true, then long before 2019, Second Circuit and Supreme Court precedent confirmed quite specifically that his speech was protected. By 2019, it was clearly established that someone who speaks to the police about a matter outside his job duties is speaking as a citizen. *See Weintraub*, 593 F.3d at 202; *Jackler*, 658 F.3d at 241. It was clearly established that speech about the possible corrupt misuse of government funds is of public concern. *See Lane*, 573 U.S. at 241. And it was clearly established that the government has no legitimate interest in suppressing speech about its own wrongdoing. *See Jackler*, 658 F.3d at 237.

No government official familiar with this precedent would reasonably think that D'Onofrio's speech about the missing money was unprotected. Cooper also argues that he deserves qualified immunity because it was not clearly established whether D'Onofrio was constructively discharged. But even if that is right, it would not help Cooper's argument, because Cooper does not otherwise dispute that D'Onofrio faced other adverse actions like losing his bonus.

Besides his speech about missing money, D'Onofrio's complaint mentions several more categories of allegedly protected speech. At the oral argument, however, he abandoned the rest of his claim except with respect to one other category of speech: his complaints about the rodents. But this part of his claim must be dismissed, because he has not plausibly alleged that he voiced those complaints as a citizen.

Instead, his complaints about rodents appear to be squarely within the scope of his job. He was the Director of Community Health. And he claims that the rodents left droppings in "clinic patient service" areas and infested the safety equipment used during health inspections.[24] If he is right, then the rodents were directly threatening the community's health. Speaking up about them was part of his job. Moreover, while D'Onofrio did complain about the rodents to the Connecticut Interlocal Risk Management Agency, he does not allege that CIRMA is an agency that (like the police department) all citizens can consult.

D'Onofrio has thus failed to plausibly allege that his speech on the rodent droppings was not pursuant to his official duties. It is therefore not protected. His First Amendment retaliation claim against Cooper may proceed only with respect to his complaints about the allegedly missing money.

### Conn. Gen. Stat. § 31-51q (Counts Two and Three)

Next, D'Onofrio brings two claims under Conn. Gen. Stat. § 31-51q. Under § 31-51q, no employer may "subject[ ] any employee to discipline or discharge on account of the exercise … of rights guaranteed by the first amendment to the United States Constitution or [the Connecticut analogue]." To prevail on a claim for retaliation under § 31-51q, a plaintiff must show that he engaged in protected speech that was causally linked to a discipline or discharge he suffered, and

---

[24] Doc. #12 at 2–4 (¶¶ 7, 9, 15).

that the protected activity did not interfere with the central purposes of the employment relationship. *See McClain v. Pfizer, Inc.*, 692 F. Supp. 2d 229, 241 (D. Conn. 2010).

In Count Two, D'Onofrio alleges that he was disciplined or discharged in violation of his First Amendment rights. As I have just explained, D'Onofrio has plausibly alleged that only some of his speech was protected by the First Amendment. So like Count One, Count Two must be narrowed to cover only his speech about the missing money.

By contrast, I will not narrow Count Three to cover only some categories of speech. In Count Three, D'Onofrio alleges discipline or discharge in violation of his *Connecticut* constitutional rights. And the Connecticut Constitution protects employees' speech more broadly than the First Amendment does. *See Trusz v. UBS Realty Invs., LLC*, 319 Conn. 175, 178–79 (2015). For now, the District has not argued that D'Onofrio's speech was unprotected under Connecticut law.[25] Thus, for the purposes of this motion, I will assume that all his speech was protected.

Still, both Counts Two and Three must be narrowed in another way. Although D'Onofrio has alleged that he was both disciplined *and* discharged, he has plausibly alleged only that he was disciplined. Discipline is an "adverse material consequence imposed by an employer on an employee for the purpose of punishing or deterring behavior that the authority wishes to suppress." *Browne v. State Dep't of Correction*, 2017 WL 5243854, at *3 (Conn. Super. Ct. 2017) (Ecker, J.). D'Onofrio was plausibly disciplined when he lost his bonus.

He was not, however, discharged. In fact, he quit. To get around that, D'Onofrio now argues that he was *constructively* discharged. I do not agree. "Constructive discharge of an employee occurs when an employer … intentionally creates an intolerable work atmosphere that

---

[25] Doc. #19 at 25 n.8.

10

forces an employee to quit involuntarily." *Karagozian v. USV Optical, Inc.*, 238 A.3d 716, 722 (Conn. 2020) (emphasis omitted). D'Onofrio has not alleged facts to plausibly suggest that the District constructively discharged him.

In fact, his complaint expressly contradicts that possibility. D'Onofrio alleges that he resigned because his workplace "was hazardous to health and safety of himself, co-workers, and members of the public who frequented the agency offices."[26] Yet he does not allege that the District created these conditions in order to force him out. Nor could he: Many of his complaints were *about* those conditions. The conditions could not have been *responses* to his protected activity. There is thus no basis for D'Onofrio to proceed on a constructive discharge theory. I will therefore limit Counts Two and Three to his claim of wrongful discipline.

### Constructive Discharge (Count Four)

D'Onofrio also brings a freestanding claim for constructive discharge. But in Connecticut, "no such independent cause of action exists." *Sophia v. City of Danbury*, 116 Conn. App. 68, 74 (2009). Therefore, as D'Onofrio conceded at argument, Count Four must be dismissed.

### CONCLUSION

I will GRANT in part and DENY in part the defendants' motion to dismiss. Counts One and Two may proceed only with respect to D'Onofrio's speech about the allegedly missing money and not with respect to the other speech mentioned in the complaint. Counts Two and Three may proceed only on a theory of wrongful discipline and not on a theory of wrongful discharge. Counts One through Three are otherwise dismissed without prejudice. Finally, Count Four is dismissed with prejudice.

---

[26] Doc. #12 at 8 (¶ 45).

It is so ordered.

Dated at New Haven this 2nd day of June 2022.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge