UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LOUIS D'ONOFRIO,
    *Plaintiff*,

    v.

No. 3:21-cv-1052 (JAM)

WESTPORT/WESTON HEALTH DISTRICT
*et al.*,
    *Defendants*.

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Louis D'Onofrio, a former employee of the Westport/Weston Health District

("WWHD"), filed suit against his supervisor Mark Cooper and the WWHD. He claims that

Cooper retaliated against him for his exercise of First Amendment rights and that the WWHD

likewise discharged or disciplined him in violation of state law—Conn. Gen. Stat. §31-51q—for

exercising his free speech rights.

For the reasons stated below, I agree with D'Onofrio that there is a genuine fact issue to

show that he engaged in protected constitutional speech, but I will grant the defendants' motion

for summary judgment because the record does not establish a genuine issue of fact to show that

D'Onofrio was subject to retaliation, discipline, or discharge for exercising his free speech rights.

**BACKGROUND**

The following facts are drawn primarily from the parties' statements of material facts and

the documents they reference. At the time of the events giving rise to this case, D'Onofrio was

employed part-time as the Director of Community Health for defendant WWHD.[1] The WWHD

is statutorily authorized to provide for the public health of its municipalities: Westport and

Weston.[2] The WWHD is governed by a Board of Directors (the "Board") appointed by the

---

[1] Doc. #122 at 2 (¶¶ 7–8).
[2] *Id.* at 1 (¶ 1).

Westport and Weston First Selectmen and, at all times relevant here, Otis Crawford was the

Chairman of the Board.[3] Cooper served as the WWHD's Director of Public Health, supervising

and directing all WWHD employees including D'Onofrio.[4]

As the Director of Community Health, D'Onofrio's duties included managing clinics and

nursing staff, placing lab orders, monitoring vaccine stock, and meeting the community's needs

during the COVID-19 pandemic.[5] He was also a mandated reporter for insurance fraud.[6] The

parties disagree as to whether reviewing the WWHD's finances was part of D'Onofrio's duties,

but D'Onofrio maintains that he would only periodically "request [financial information] to see

if there was something he could do to contribute."[7] While defendants contend that D'Onofrio

and Cooper met two to three times a week to discuss the WWHD's finances, D'Onofrio claims

that "he had at least three conversations" with Cooper about charging for COVID-19 vaccines

specifically, not finances generally.[8]

In February 2020, D'Onofrio reviewed the WWHD's profit and loss report for that month

"out of curiosity to see what the clinic's budget was."[9] In the course of his review, D'Onofrio

noted that $70,000 was "missing."[10] In March 2020, D'Onofrio met with Cooper, the auditor,

and the bookkeeper to discuss his concerns.[11] They explained to D'Onofrio that the missing

money was the result of an accounting application error, and Cooper considered the matter

closed.[12]

---

[3] *Id.* at 1 (¶¶ 3, 5).
[4] *Id.* at 1–2 (¶¶ 4, 6).
[5] *Id.* at 2–3 (¶¶ 13–17).
[6] *Id.* at 3 (¶ 18).
[7] *Id.* at 4 (¶ 20).
[8] *Id.* at 4 (¶ 21).
[9] *Id.* at 7 (¶ 42).
[10] *Id.* at 7 (¶ 43).
[11] *Id.* at 7 (¶ 44).
[12] *Id.* at 7 (¶¶ 44–46). D'Onofrio's flat denial fails to comport with the requirements of D. Conn. L. Civ. R. 56(a)(3). Accordingly, I have deemed this fact admitted. *See Chiaravallo v. Middletown Transit Dist.*, 561 F. Supp. 3d 257,

On or about March 29, 2021, Crawford told D'Onofrio that he would be receiving a bonus for his work during the COVID-19 pandemic.[13] On April 12, the Board decided to award bonuses only to full-time WWHD employees.[14] Cooper was not involved in the Board's decision and was only informed of the bonuses on April 22.[15]

In the meantime, on April 21 and 23, D'Onofrio met with a Westport Police Detective.[16] The defendants claim that D'Onofrio complained to the police about both the missing money and concerns over vaccine stock, but D'Onofrio contends his complaint was limited to the missing money and that he "unequivocally never stated to the [police] that he was complaining about missing vaccine stock."[17]

On April 28, however, the Westport First Selectman told Crawford that D'Onofrio had "complained [to police] about the 'missing' $70,000 and that vaccines were also missing from the WWHD's stock."[18] D'Onofrio reiterated his concerns about missing money to Crawford on April 29.[19] On May 3, Crawford told Cooper "that [D'Onofrio] made a complaint to the Westport Police alleging that there was $70,000 'missing' and that a question was raised about vaccine stock."[20]

---

269 (D. Conn. 2021) (collecting cases).

[13] Doc. #122 at 5–6 (¶¶ 32, 34).

[14] *Id.* at 5–6 (¶ 32).

[15] *Id.* at 5–6 (¶¶ 32, 37).

[16] *Id.* at 8 (¶ 48); Doc. #124 at 10.

[17] Doc. #122 at 9 (¶ 52).

[18] *Id.* at 8–9 (¶¶ 51–52). D'Onofrio denies the First Selectman's conversation with Crawford through citing his complaint. *See id.* at 8 (¶ 51). But "allegations are not evidence and cannot be relied upon to defeat a motion for summary judgment." *Martin v. Town of Simsbury*, 505 F. Supp. 3d 116, 125 (D. Conn. 2020). While D'Onofrio acknowledges that he "cannot vouch for what [the First Selectman] stated," he denies the characterization of his police complaint through citing his affidavit. Doc. #122 at 9 (¶ 52). But the portion of the affidavit cited is irrelevant to this matter, and "where the record itself does not support Plaintiff's denials . . . those facts are deemed to be admitted." *See Johnson v. Conn. Dep't of Admin. Servs.*, 972 F. Supp. 2d 223, 229 (D. Conn. 2013). Accordingly, I will consider these facts to be admitted.

[19] Doc. #122 at 7–8 (¶ 47); Doc. #124 at 10.

[20] Doc. #122 at 9 (¶¶ 55–56). D'Onofrio denies that Crawford shared this information with Cooper because "[f]or Plaintiff the issue was missing money not missing vaccines and that is what he reported to Westport Police." *Id.* at 9 (¶ 56). But these facts are immaterial to what Crawford said to Cooper. *See Burns v. Rovella*, 2021 WL 4263372, at *3 (D. Conn. 2021). Accordingly, I will consider this fact to be admitted.

On May 5, Cooper sent D'Onofrio a memorandum advising him that "[a]n investigation into [D'Onofrio's] concerns about missing and/or unaccounted for vaccine has been initiated."[21] The investigation concluded with Cooper and the auditor finding that there were no missing funds or vaccines.[22]

In addition to the fact of the investigation, D'Onofrio claims that he was subjected to several adverse actions.[23] First, D'Onofrio never received the bonus Crawford promised him.[24] Second, he claims that an impression of police surveillance was created when the Westport Chief of Police called D'Onofrio and "rudely instructed [him] to keep this matter within the WWHD and to not bring any concerns to the police department."[25] Third, he claims that his medical license was put at risk by "[lab] orders being put under [his] name by Mr. Cooper without [his] authorization."[26] And fourth, he claims that his workload was increased when "more COVID vaccine clinics" were scheduled "than the demand required."[27]

On May 10, D'Onofrio submitted a letter to the Board requesting that they "continue [his] annual appointment as the medical director and as the clinic's administrator."[28] The parties agree that "[a]t no time did the Board ever contemplate not continuing Plaintiff's employment."[29]

---

[21] Doc. #122 at 9 (¶ 58); Doc. #114-18 at 1.
[22] Doc. #122 at 10 (¶ 64).
[23] *Id.* at 11 (¶ 65).
[24] Doc. #124 at 15.
[25] *Id.* at 14.
[26] *Id.* at 18; *see* Doc. #122-2 at 6. Cooper argues that he "never signed off on any" lab orders. Doc. #122-1 at 65.
[27] Doc. #124 at 19.
[28] Doc. #122 at 11 (¶ 66); Doc. #114-14 at 2.
[29] Doc. #122 at 11 (¶ 67).

But then on June 16, D'Onofrio changed his mind and submitted his resignation with an effective date of July 8.[30] D'Onofrio subsequently offered to delay his resignation date, and even proposed remaining with the WWHD as a consultant, but those plans never came to fruition.[31]

On August 2, D'Onofrio filed this lawsuit against Cooper and the WWHD.[32] After I granted in part and denied in part defendants' motion to dismiss, D'Onofrio was permitted to proceed with his claim under the First Amendment against Cooper and his claim for free speech retaliation under state law against the WWHD.[33] *See D'Onofrio v. Westport/Weston Health Dist.*, 2022 WL 1809714 (D. Conn. 2022). In light of a fuller record from discovery, the defendants have now moved for summary judgment on all claims.[34]

## DISCUSSION

The principles governing review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close, contested issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*); *Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441, 445 (2d Cir. 2023).[35]

---

[30] *Id.* at 11 (¶¶ 68–69).
[31] *Id.* at 11–12 (¶¶ 70–74).
[32] Doc. #1.
[33] Doc. #34.
[34] Doc. #114.
[35] Unless otherwise indicated, this ruling for ease of readability omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

**First Amendment claim against Cooper**

Cooper moves for summary judgment as to D'Onofrio's First Amendment retaliation

claim against him. The First Amendment bars a state actor from retaliating against a person

because of a person's exercise of rights under the First Amendment. In order to prevail on a First

Amendment retaliation claim, a plaintiff must establish the following three elements: "(1) his or

her speech or conduct was protected by the First Amendment; (2) the defendant took an adverse

action against him or her; and (3) there was a causal connection between this adverse action and

the protected speech." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 94 (2d Cir. 2020). I will

address each of the three elements in turn.

The first element for the First Amendment retaliation claim is whether D'Onofrio

engaged in protected speech.[36] A public employee's speech is protected by the First Amendment

only (1) if she spoke as a citizen rather than an employee and (2) if she spoke on a matter of

public concern. *See Shara v. Maine-Endwell Cent. Sch. Dist.*, 46 F.4th 77, 82–83 (2d Cir. 2022).

In evaluating whether a public employee speaks as a citizen for First Amendment retaliation

claim purposes, a court "ask[s] whether (1) 'the speech falls outside of the employee's official

responsibilities,' and (2) 'a civilian analogue exists.'" *Brooke v. Cnty. of Rockland*, 2022 WL

6585350, at *2 (2d Cir. 2022) (quoting *Specht v. City of New York*, 15 F.4th 594, 603 (2d Cir.

2021)).

While the plain language of D'Onofrio's job description does not include any duties

related to financial management or reporting, "the Supreme Court [has] adopted a functional

---

[36] Cooper contends that he was told D'Onofrio "made a complaint to the Westport Police alleging that there was $70,000 'missing' and that a question was raised about vaccine stock." Doc. #122 at 9 (¶ 56). But D'Onofrio claims he "unequivocally never stated to the Westport Police Detective nor the Westport Police Chief that he was complaining about missing vaccine stock." *Id.* at 9 (¶ 52). Viewing the facts in the light most favorable to D'Onofrio for purposes of what he describes as the scope of his protected conduct, my analysis of whether his speech was protected is confined to speech regarding the missing money. The extent to which D'Onofrio was also understood to have complained about missing vaccine stock is discussed later in this ruling.

approach toward evaluating an employee's job duties."[37] *Matthews v. City of New York*, 779 F.3d 167, 173 (2d Cir. 2015). Accordingly, "[s]peech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." *Severin v. N.Y.C. Dep't of Educ.*, 2024 WL 1904574, at *1 (2d Cir. 2024) (quoting *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010)).

The defendants argue that D'Onofrio "routinely received and reviewed financial information and statements" and discussed financial matters with Cooper two to three times a week.[38] But D'Onofrio claims, to the contrary, that he "would at times request [financial information and statements] to see if there was something he could do to contribute" but it was not "expected of him."[39] Similarly, he recalls having "at least three conversations" with Cooper about charging for the administration of the COVID-19 vaccine—not general financial matters.[40] Here, a genuine fact dispute as to the regularity of D'Onofrio's involvement in financial matters makes it impossible for me to say "whether the speech at issue [wa]s itself ordinarily within the scope of" D'Onofrio's duties.[41] *Brooke*, 2022 WL 6585350, at *2.

Moreover, there is a direct civilian analogue to D'Onofrio's speech because, by speaking to the police about his concerns, his "speech was to 'an independent state agency' responsible for entertaining complaints by 'any citizen in a democratic society regardless of his status as a public employee.'" *Jackler v. Byrne*, 658 F.3d 225, 241 (2d Cir. 2011) (quoting *Weintraub*, 593 F.3d at 204).

---

[37] *See id.* at 2–3 (¶¶ 13–15).
[38] *Id.* at 4 (¶¶ 20–21).
[39] *Id.* at 4 (¶ 20).
[40] *Id.* at 4 (¶ 21).
[41] The Supreme Court has cautioned that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane v. Franks*, 573 U.S. 228, 240 (2014). It may therefore be relevant but not dispositive that D'Onofrio acquired information about the missing funds through his employment at the WWHD.

Finally, D'Onofrio clearly spoke on a matter of public concern. An employee's speech touches on a matter of public concern if it fairly relates to any matter of political, social, or other concern to the community. *See Shara*, 46 F.4th at 84. Allegations about the "misallocation of public funds, [are a] matter[] of serious public concern." *Vasbinder v. Ambach*, 926 F.2d 1333, 1340 (2d Cir. 1991); *see Lane*, 573 U.S. at 241 (noting that speech on the "misuse of state funds . . . obviously involves a matter of significant public concern").

Next, I consider the *Pickering* balancing test and ask whether the potential disruption to the government's activities caused by plaintiff's speech justifies the government's treatment of him. *See Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563 (1968). The analysis permits a government employer to "take an adverse employment action against a public employee for speech on matters of public concern if: (1) the employer's prediction of the disruption that such speech will cause is reasonable; (2) the potential for disruption outweighs the value of the speech; and (3) the employer took the adverse employment action not in retaliation for the employee's speech, but because of the potential for disruption." *Castine v. Zurlo*, 756 F.3d 171, 175 (2d Cir. 2014); *see Enders v. Boone*, 658 F. Supp. 3d 70, 87 (N.D.N.Y. 2023) (same). The burden of demonstrating these elements is on the defendant, *Castine*, 756 F.3d at 177, and the balancing test can justify "only those speech restrictions that are necessary for their employers to operate efficiently and effectively," *Jackler*, 658 F.3d at 235.

Cooper has not shown that no genuine issue of fact remains as to the reasonableness of the actions that were taken. D'Onofrio's speech about the potential misuse of public funds was of high public value. *See Jackler*, 658 F.3d at 236 ("Exposure of official misconduct . . . is generally of great consequence to the public."); *Bourne v. City of Middletown*, 2017 WL 1138125, at *8 (D. Conn. 2017) (same). Cooper claims that D'Onofrio's speech "had the

8

potential to be massively disruptive to WWHD" by "undermin[ing] the public's confidence in WWHD and its operations, which would be especially disruptive during a pandemic."[42] But "[c]ourts have been hesitant to weigh seriously the disruption government entities may face because of the exposure of their illicit conduct." *Bourne*, 2017 WL 1138125, at *8; *see Jackler*, 658 F.3d at 242; *Frank v. Relin*, 1 F.3d 1317, 1331 (2d Cir. 1993). And there is no reason to weigh disruption particularly heavily here. Nor has Cooper shown that actions against D'Onofrio were "necessary . . . to operate efficiently and effectively." *Jackler*, 658 F.3d at 235. On balance, there is at least a genuine fact issue to show that the value of D'Onofrio's speech outweighed the costs attributable to it. Viewing the facts in the light most favorable to D'Onofrio, I conclude that there is a genuine fact issue to show that his speech was protected under the First Amendment.

That brings me to the second element of the First Amendment retaliation claim: whether Cooper subjected D'Onofrio to an adverse action, meaning any action that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Connelly v. Cnty. Rockland*, 61 F.4th 322, 325 (2d Cir. 2023). Typical adverse employment actions include "discharging, refusing to hire, refusing to promote, demoting, reducing the pay, or reprimanding an employee." *Montero v. City of Yonkers*, 890 F.3d 386, 401 (2d Cir. 2018). But "[t]his list of retaliatory conduct is certainly not exhaustive," and "lesser actions may also be considered adverse employment actions." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 (2d Cir. 2006).

D'Onofrio points to several alleged adverse actions.[43] First, Cooper initiated an investigation of vaccine stock. Second, an impression of surveillance was created. Third,

---

[42] Doc. #114-1 at 31.
[43] Doc. #122 at 11 (¶ 65).

D'Onofrio never received his bonus. Fourth, Cooper endangered D'Onofrio's medical license by authorizing lab orders under D'Onofrio's name. And fifth, D'Onofrio's workload was increased.

But not all of D'Onofrio's claims satisfy this element. Although D'Onofrio was "concerned for his own safety and well-being" after receiving a call from the Westport Chief of Police, he has not proffered any evidence that Cooper "acted in concert with law enforcement" in orchestrating this call.[44] *See Brenes v. City of New York*, 2009 WL 742163, at *2 (2d Cir. 2009) (granting summary judgment in part because plaintiff provided no evidence that defendants "ordered" others to retaliate against plaintiff). And "[c]onclusory allegations of that sort are not sufficient to withstand summary judgment." *Dorsey v. Gannon*, 2024 WL 1338772, at *2 (2d Cir. 2024).

Similarly, D'Onofrio has not provided any evidence that his bonus was withheld *because of* Cooper. D'Onofrio claims that "Cooper took away [his] bonus" after D'Onofrio complained to the police.[45] But the parties agree that "all decisions related to pay and bonuses are made by the Board, not Mr. Cooper."[46] D'Onofrio argues that "whether it was Crawford or Cooper who decided not to grant the bonus after Plaintiff's reports to the police is not really relevant."[47] But Cooper's involvement in this alleged adverse action is critical because a plaintiff must "'establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity' under 42 U.S.C. § 1983."[48] *Maione v. McDonald*, 2023 WL 4759251, at *4 (2d Cir. 2023) (quoting *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir.

---

[44] Doc. #124 at 14.
[45] Doc. #56-1 at 7 (¶ 38).
[46] Doc. #122 at 1–2 (¶ 6); *see also id.* at 6 (¶ 33).
[47] Doc. #124 at 15 n.4.
[48] The complaint does not specify whether Cooper was sued in his individual or official capacity. And "[w]hen a complaint is silent as to whether a defendant is named in their individual or official capacity, the Court assumes that actor is named in their individual capacity." *Santucci v. Levine*, 2021 WL 76337, at *9 (S.D.N.Y. 2021) (collecting cases).

10

2016)). Because D'Onofrio has not proffered any evidence regarding Cooper's personal involvement, he cannot base his First Amendment retaliation claim against Cooper on the impression of surveillance or withholding of the bonus.

D'Onofrio's claim that he had "a larger than normal workload placed upon him[]" after his complaint is also without genuine support in the record.[49] He contends that "more COVID vaccine clinics" were scheduled "than the demand required."[50] But "[a]dditional work assignments will generally not constitute adverse actions for purposes of a retaliation claim." *Kelly v. N.Y. State Off. of Mental Health*, 200 F. Supp. 3d 378, 406 (E.D.N.Y. 2016). Indeed, "an increased workload is considered only a mere alteration of job responsibilities" and has been considered an adverse action only when the workload is "heavily disproportionate to those similarly situated." *Ahmad v. N.Y.C. Health & Hosps. Corp.*, 2021 WL 1225875, at *21 (S.D.N.Y. 2021) (collecting cases).

But D'Onofrio has not claimed that his workload was "heavily disproportionate" to other WWHD employees. Moreover, the additional vaccine clinics not only increased D'Onofrio's workload, but also those of the other WWHD employees staffing the clinics. Indeed, far from being subject to surprise workload demands, D'Onofrio declares that his "work for WWHD . . . came on the heels of the worst pandemic in the United States in close to a century."[51] Accordingly, D'Onofrio has failed to establish a fact issue to suggest that he was made to work more in retaliation for his exercise of his First Amendment rights.

That leaves D'Onofrio's claims of a pretextual investigation and forged lab orders. It is unclear to me that a reasonable jury could find that these were adverse actions caused by

---

[49] Doc. #124 at 19.
[50] *Ibid.*
[51] Doc. #124 at 1.

Cooper's retaliatory motives. But because the outcome of this ruling (as discussed below) turns on factors of causation other than whether these particular acts qualify as adverse actions, I will assume without deciding that the investigation and lab orders qualify as adverse actions.

So that brings me to the third element of the First Amendment retaliation claim: whether there is a causal connection between D'Onofrio's protected speech and the alleged adverse action that is attributable—if at all—to Cooper. A plaintiff must show that the protected speech was a substantial motivating factor for the adverse employment action. *See Heim v. Daniel*, 81 F.4th 212, 222 (2d Cir. 2023).[52] A plaintiff may establish causation either "directly by evidence of retaliatory animus" or "indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment." *Morales v. City of New York*, 2022 WL 2840035, at *2 (2d Cir. 2022).

D'Onofrio cannot establish causation as to the allegedly forged lab orders. He has not produced any evidence that Cooper had a "retaliatory motive" in authorizing these lab orders that would satisfy this "causal link." *Ibid*. Nor can D'Onofrio establish indirect causation because he does not "remember the specific year or month" when these lab orders were entered.[53] Accordingly, D'Onofrio cannot base his First Amendment retaliation claim on the lab order authorizations.

To be sure, the investigation was initiated just two weeks after the protected speech. *See Gunn v. Beschler*, 2023 WL 2781295, at *3 (2d Cir. 2023). But at the summary judgment stage, temporal proximity is not enough alone to establish retaliatory causation. *See Carr v. N.Y.C.*

---

[52] While a defendant may rebut a plaintiff's causal showing by proving that the same action would have been taken even if the plaintiff had not engaged in the protected speech, *see Heim*, 81 F.4th at 222 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–86 (1977)), defendants do not seek summary judgment on this defense.

[53] Doc. #122-2 at 33 ("A In the absence of me in the clinic, Mark Cooper directed the staff to put a Covid-19 test order in under my name without my approval. Q When was that? A I don't know the specific date. . . . Q Was it in 2020? A I don't remember the specific year or month.").

*Transit Auth.*, 76 F.4th 172, 182 (2d Cir. 2023); *Castagna v. Sansom*, 2024 WL 197462, at \*12 (D. Conn. 2024). And D'Onofrio cannot establish direct causation as to the investigation. D'Onofrio claims he "unequivocally never complained to anyone about missing vaccine stock."[54] But the undisputed record shows that a First Selectman told Crawford on April 28 that D'Onofrio "complained [to police] about the 'missing' $70,000 *and that vaccines were also missing from the WWHD's stock*."[55] Crawford then relayed this information to Cooper on May 3.[56]

Regardless of what D'Onofrio actually complained to police about, the undisputed fact is that Cooper was told that the complaint involved missing money and vaccines. So he understandably initiated an investigation as to both the claims of missing money and vaccines. If a supervisor or employer launches an investigation based on what he has been told is an employee's claim of misconduct, it makes no sense to say that the investigation has been launched to improperly "retaliate" against the employee's claim of misconduct. Notwithstanding D'Onofrio's insistence that he only complained about missing money, the record here shows the investigation was launched to properly investigate what was understood by Cooper to be a broader claim of misconduct about both the missing money and missing vaccine.

So there is no genuine fact issue to show that Cooper bore any retaliatory animus that caused any adverse action to D'Onofrio from his investigation of what he was told was D'Onofrio's claim of misconduct. *See Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 147 (2d Cir. 2014) (finding that employees "may not claim retaliation simply because the employer undertakes a factfinding investigation" in response to a complaint).[57]

---

[54] Doc. #122 at 9 (¶ 58).
[55] *Id.* at 8–9 (¶¶ 51–52) (emphasis added).
[56] *Id.* at 9 (¶¶ 55–56).
[57] While *Cox* arose in the Title VII retaliation context, the same causation analysis applies to First Amendment

In sum, even when viewing the facts in the light most favorable to D'Onofrio, I conclude that there is no genuine fact issue to support D'Onofrio's claim that Cooper retaliated against him in violation of the First Amendment. Accordingly, I will grant Cooper's motion for summary judgment with respect to the First Amendment claim.

### State law retaliation claim against WWHD

The WWHD likewise moves for summary judgment as to D'Onofrio's state law retaliation claim. Connecticut law makes it unlawful for an employer to discharge or discipline an employee because of the employee's exercise of free-speech rights that are subject to protection under the federal or state constitutions. Conn. Gen. Stat. § 31-51q(b).[58] As the text of § 31-51q makes clear, the statute is "restricted to retaliation . . . in the form of 'discipline or discharge,' which may not extend to as broad a range of actions as the 'adverse action' requirement that applies for a claim of First Amendment retaliation . . . under 42 U.S.C. § 1983." *Light v. City of New Haven Bd. of Educ.*, 2024 WL 1199717, at *8 (D. Conn. 2024).

As to discharge, D'Onofrio asks me to reconsider my prior ruling precluding him from proceeding on a constructive discharge theory.[59] *See D'Onofrio*, 2022 WL 1809714, at *6. "Constructive discharge of an employee occurs when an employer . . . *intentionally* creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's

___

claims. *See Karam v. Cnty. of Rensselaer*, 2016 WL 51252, at *10 (N.D.N.Y. 2016) (citing *Feingold v. New York*, 366 F.3d 138, 160 (2d Cir. 2004)).

[58] The statute reads in relevant part: "[A]ny employer, including the state and any instrumentality or political subdivision thereof, who subjects or threatens to subject any employee to discipline or discharge on account of (1) the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages." Conn. Gen. Stat. § 31-51q(b).

[59] Doc. #124 at 40–41.

shoes would have felt compelled to resign." *Karagozian v. USV Optical, Inc.*, 335 Conn. 426, 434 (2020).

But the record refutes this request. After D'Onofrio submitted his resignation, he offered to delay his departure date and even proposed remaining with the WWHD as a consultant. Such offers are not indicative of working conditions in which a "reasonable employee would feel compelled to resign." *Id.* at 440. Accordingly, no reasonable jury could conclude that D'Onofrio was constructively discharged as required to sustain a claim under § 31-51q.

The same holds true for D'Onofrio's claim of discipline under § 31-51q. Indeed, D'Onofrio admitted that he was "not disciplined by WWHD."[60] A party's admission is considered "conclusively established" unless a court permits its withdrawal upon the admitting party's motion. Fed. R. Civ. P. 36(b). But D'Onofrio has not moved to withdraw his admission. Accordingly, no reasonable jury could conclude that D'Onofrio was disciplined as required to sustain a claim under § 31-51q.

In short, even assuming that D'Onofrio engaged in protected speech activity under § 31-51q, there is no genuine issue of fact to support his claim that WWHD subjected him to discipline or discharge because of this protected activity. Accordingly, I will grant the WWHD's motion for summary judgment as to D'Onofrio's state law retaliation claim.

## CONCLUSION

For the reasons set forth above, the Court GRANTS the defendants' motion for summary judgment (Doc. #114). The Clerk of Court shall close this case.

It is so ordered.

---

[60] Doc. #114-7 at 2 (¶ 8). Although D'Onofrio subsequently denied that he was never disciplined by WWHD in response to defendants' Rule 56(a)(1) Statement of Undisputed Material Facts, that denial was based on alleged "adverse employment actions that were disciplinary in nature" and not discussed during his deposition. Doc. #122 at 2 (¶ 10). D'Onofrio's denial did not reference his previous admission.

Dated at New Haven this 30th day of July 2024.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge